Approved: _____
QAIS GHAFARY
Assistant United States Attorney

Before: THE HONORABLE ANDREW E. KRAUSE
United States Magistrate Judge
Southern District of New York

- - - - - - - - - - - - - - - - -X

UNITED STATES OF AMERICA

- v. -

CATHERINE SEEMER,

    a/k/a "Catherine D'Onofrio"

                  Defendant.

- - - - - - - - - - - - - - - - -X

SEALED COMPLAINT 22ᴍᴊ5084

Violations of
18 U.S.C. §§ 1343,
1028A, and 2;
20 U.S.C. § 1097

COUNTY OF OFFENSE:
WESTCHESTER

SOUTHERN DISTRICT OF NEW YORK, ss.:

    ANTHONY PERSAUD, being duly sworn, deposes and says that he is a Special Agent with the U.S. Department of Education, Office of Inspector General ("DOE-OIG"), and charges as follows:

COUNT ONE
(Wire Fraud)

    1.    From at least in or about June 2017 through at least in or about March 2022, in the Southern District of New York and elsewhere, CATHERINE SEEMER, a/k/a "Catherine D'Onofrio," the defendant, willfully and knowingly, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, did transmit and cause to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds, for the purpose of executing such scheme and artifice, to wit, SEEMER defrauded federal and private programs designed to discharge the student loans of disabled borrowers by submitting, or causing to be submitted, false applications and forged medical certifications for borrowers who were not disabled, and did so through the use of telephone communications and the internet.

(Title 18, United States Code, Sections 1343 and 2.)

## COUNT TWO
### (Federal Financial Aid Fraud)

2.  From at least in or about June 2017 through at least in or about March 2022, in the Southern District of New York and elsewhere, CATHERINE SEEMER, a/k/a "Catherine D'Onofrio," the defendant, knowingly and willfully embezzled, misapplied, stole, obtained by fraud, false statement, and forgery, and attempted to do so, funds, assets, and property provided and insured by the United States Department of Education ("DOE"), to wit, SEEMER defrauded a DOE-administered federal program designed to discharge the federal student loans of disabled borrowers of at least approximately $10.5 million by submitting, or causing to be submitted, false applications and forged medical certifications for borrowers who were not disabled.

(Title 20, United States Code, Section 1097(a).)

## COUNT THREE
### (Aggravated Identity Theft)

3.  From at least in or about June 2017 through at least in or about March 2022, in the Southern District of New York and elsewhere, CATHERINE SEEMER, a/k/a "Catherine D'Onofrio," the defendant, knowingly did transfer, possess, and use, without lawful authority, a means of identification of another person, during and in relation to a felony violation enumerated in Title 18, United States Code, Section 1028A(c), to wit, SEEMER transferred, possessed, and used the names, medical license numbers, and forged signatures of multiple physicians in connection with the offense charged in Count One of this Complaint.

(Title 18, United States Code, Sections 1028A(a)(1), 1028A(b), and 2.)

The bases for my knowledge and for the foregoing charges are, in part, as follows:

4.  I am a Special Agent with the DOE-OIG and I have been personally involved in the investigation of this matter. This affidavit is based upon my personal participation in the investigation of this matter, my conversations with law enforcement agents, witnesses, and others, as well as my examination of report and records. Because this affidavit is being submitted for the limited purpose of establishing probable

2

cause, it does not include all the facts that I have learned during the course of my investigation. Where the contents of documents and the actions, statements, and conversations of others are reported herein, they are reported in substance and in part, except where otherwise indicated. Where figures, calculations, and dates are set forth herein, they are approximate, unless stated otherwise.

### Background on the Total and Permanent Disability Student Loan Discharge Programs

5. Based on my training and experience, my participation in this investigation, and my discussion with other law enforcement members, I have learned the following, in substance and in part:

   a. DOE administers various educational financial assistance programs, including federally guaranteed student loan programs that require a borrower to repay awarded educational loans ("federal student loans"). Under DOE's Total and Permanent Disability ("TPD") discharge program (the "Federal TPD Program"), an applicant may apply for discharge of certain qualified federal student loans if the applicant demonstrates that he or she is totally and permanently disabled. At various points, federal student loan servicers, such as a particular loan servicer ("Loan Servicer-1"), administered the Federal TPD Program on behalf of DOE.

   b. The Federal TPD Program application (the "Federal TPD Application") requires, among other things, an applicant's personal identifying information ("PII") and a signed certification that the applicant has a "total and permanent disability, as defined in Section 5."

      i. Section 5 of the Federal TPD Application provides that an applicant has a "total and permanent disability" if they "are unable to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment that can be expected to result in death, or that has lasted for a continuous period of not less than 60 months, or that can be expected to last for a continuous period of not less than 60 months" or otherwise qualify via certain social security disability- or veteran-based means.

      ii. The Federal TPD Application also provides the following notice: "WARNING: Any person who knowingly makes a false statement or misrepresentation on this form or on any accompanying document is subject to penalties that may include

3

fines, imprisonment, or both, under the U.S. Criminal Code and 20 U.S.C. § 1097."

   c. A Federal TPD Program applicant may establish his or her total and permanent disability, among other ways, by submitting a certification from a licensed medical doctor.

     i. The physician certification must confirm that the applicant has a "medically determinable physical or mental impairment that prevents the applicant from engaging in any substantial gainful activity," which the certification form defines as "a level of work performed for pay or profit that involves doing significant physical or mental activities or a combination of both."

     ii. The physician certification further provides that, "[i]f the applicant is able to engage in any substantial gainful activity in any field of work, you must answer 'No'" and "Do not complete this application."

     iii. Finally, the physician certification requires that the certifying physician describe (i) the diagnosis for the applicant's impairment; (ii) the severity of the impairment; (iii) limitations on the applicant's ability to sit, stand, walk, or lift; (iv) limitations on the applicant's activities of daily living; (v) the applicant's residual functionality; (vi) any social or behavior limitations of the application; and, (vii) for psychiatric conditions, a global assessment function score.

     iv. At the conclusion of the physician certification, above the physician's signature line, the physician is again required to certify that "in [the physician's] best professional judgment, the applicant identified … has a medically determinable physical or mental impairment" and that the physician "understand[s] that an applicant who is currently able to engage in any substantial gainful activity in any field of work does not have a total and permanent disability as defined on this form."

  6. Based on my training and experience, my participation in this investigation, and my discussion with other law enforcement members, I have learned the following, in substance and in part:

   a. Many private student loan lenders offer a TPD discharge program for private student loans that is analogous to the Federal TPD program (the "Private TPD Program" and,

4

collectively with the Federal TPD Program, the "TPD Programs"). An applicant under the Private TPD Program may apply for discharge of certain qualified private student loans if the applicant demonstrates that he or she is totally and permanently disabled. At various points, private student loans servicers, such as a particular loan servicer ("Loan Servicer-2," and collectively with Loan Servicer-1, the "Loan Servicers"), administered the Private TPD Program on behalf of private student loan lenders.

   b. Mirroring the Federal TPD Program, the Private TPD Program application form (the "Private TPD Application") directs borrowers, in bold writing at the top of the application, to "[c]omplete this form if you are totally and permanently disabled. Total and permanent disability means the inability to work in any occupation due to a condition that began or deteriorated after the date of the Disclosure and the disability is expected to be permanent."

    i. The Private TPD Application also requests information about the applicant's date of injury or disability, date of last active performance of job duties, the nature of the disease or injury causing disability, the date on which a physician was consulted about the disability, the names and contact information for the certifying physician, the specific disability diagnosed, dates of hospitalization, and any work that the applicant was performing at the time of the application.

    ii. The Private TPD Application also requires a physician's certification that further details the applicant's disability diagnosis, objective and subjective symptoms, dates of service, impairment levels, and specific certification about whether the applicant is totally disabled and whether the applicant's condition is expected ever to improve.

    iii. Directly above both the applicant's signature line in the Private TPD Application and the physician's signature line in the physician certification portion of the Private TPD Application is a warning: "NOTICE: Any person who, with intent to defraud or knowing that he/she is facilitating a fraud against the program, submits an application or files a claim containing a false or deceptive statement may be guilty of fraud. The commission of fraud may subject such person to criminal and/or civil penalties."

5

Overview of the Defendant's TPD Fraud Scheme

7. CATHERINE SEEMER, a/k/a "Catherine D'Onofrio," the defendant, orchestrated a fraud scheme (the "TPD Fraud Scheme") whereby she submitted or caused to be submitted numerous fraudulent TPD Program discharge applications that resulted in the discharge of millions of dollars' worth of student loan obligations held by borrowers ("Borrowers") who were not disabled or otherwise qualified under the TPD Program. In some instances, SEEMER led Borrowers to believe that she was providing them a student loan debt counseling service by which she identified and secured financial aid, grants, or other loan relief for which Borrowers were eligible. In other instances, SEEMER led Borrowers to believe that they qualified for the TPD Program by virtue of their support of elderly, ailing, or disabled family members.

8. In reality, SEEMER used Borrowers' PII and student loan information to submit or cause to be submitted fraudulent TPD applications that falsely represented Borrowers' purported permanent physical and/or mental disabilities as well as specific medical conditions causing those disabilities. The false representations in the fraudulent TPD applications were also supported by falsified medical certifications purportedly on behalf of medical professionals who, in reality, had never diagnosed or treated the Borrowers, nor certified the Borrowers' permanent physical and/or mental disabilities. SEEMER charged Borrowers fees for her services, which were often between 10% to 20% of the total loan amount discharged.

Scope of the TPD Fraud Scheme

9. Based on my review of student loan and TPD discharge-related records from DOE and the Loan Servicers, my review of records from two particular mobile payment service companies ("Payment App-1" and "Payment App-2"), law enforcement interviews of Borrowers and physicians, my discussion with other law enforcement members, and my participation in this investigation, I have learned the following, in substance and in part:

    a. From at least in or about June 2017 through at least in or about March 2022, as part of the TPD Fraud Scheme, CATHERINE SEEMER, a/k/a "Catherine D'Onofrio," the defendant, submitted or caused to be submitted Federal and Private TPD Program applications that falsely certified the total and permanently disability of over 125 unique Borrowers (the "Fraudulent TPD Applications").

   b. Each Fraudulent TPD Application also included a forged physician certification about the Borrower's total and permanent disability and a false diagnosis and medical history in support of that certification.

   c. The identities, forged signatures, and medical license numbers of at least a dozen physicians were used, without authorization and unbeknownst to those physicians, to falsely certify the total and permanent disability of Borrowers.

   d. SEEMER caused the fraudulent discharge of over approximately $10.5 million worth of federal student loans and additional amounts of private student loans.

   e. SEEMER often charged Borrowers fees worth between 10% to 20% of the total loan amount discharged. It is estimated that SEEMER earned at least approximately $1 million as a result of the TPD Fraud Scheme.

### Execution of the TPD Fraud Scheme

 10. Based on my review of student loan and TPD discharge-related records from DOE and the Loan Servicers, my review of records from Payment App-1 and Payment App-2, law enforcement interviews of Borrowers and physicians, my review of electronic communications between Borrowers and CATHERINE SEEMER, a/k/a "Catherine D'Onofrio," the defendant, my discussion with other law enforcement members, and my participation in this investigation, I have learned the following, in substance and in part:

   a. In executing the TPD Fraud Scheme, SEEMER obtained from Borrowers their PII and student loan information, provided Borrowers false explanations for the student loan relief that she would obtain for them, and collected fees from Borrowers. SEEMER frequently used text message and telephonic communications with Borrowers to accomplish these tasks. For both types of communications with Borrowers, SEEMER frequently used a particular telephone number subscribed to SEEMER ("Telephone-1").

   b. SEEMER used the PII and student loan information of Borrowers to complete Fraudulent TPD Applications and directly or indirectly submit those applications to the Loan Servicers. Based on my training and experience and participation in this investigation, I believe that the handwriting used for Borrowers' names appears to be similar across numerous of the Fraudulent TPD Applications and belongs to SEEMER.

c. SEEMER frequently submitted the Fraudulent TPD Applications by emailing the applications to Loan Servicer-1, which processed the applications outside of New York. In other instances, SEEMER submitted the Fraudulent TPD Applications by mailing the applications from within Westchester County, New York, where SEEMER resides, to Loan Servicer-2, which processed the applications outside of New York.

d. SEEMER also communicated with the Loan Servicers about the student loans and/or the Fraudulent TPD Applications associated with Borrowers, frequently dialing-in from Telephone-1 and frequently posing as a family member of the Borrower; in some instances, SEEMER identified herself by name or with her first name and the Borrower's last name. In many instances, SEEMER provided Telephone-1 and/or her email address as a point of contact to the Loan Servicers for the Fraudulent TPD Application. Based on my training and experience, my participation in this investigation, and law enforcement interviews of multiple Borrowers, I believe that a particular female voice heard on telephone calls with Loan Servicers with regard to numerous of the Fraudulent TPD Applications appears to sound similar across multiple calls and belongs to SEEMER.

e. Among the Fraudulent TPD Applications SEEMER submitted or caused to be submitted, a diagnosis of bipolar disorder was used to falsely certify the total and permanent disability of over 90 unique Borrowers. Other common diagnoses used in support of these false certifications included schizophrenia, post-traumatic stress disorder, and multiple sclerosis. Based on my training and experience and participation in this investigation, I believe that the handwriting used for the specific diagnoses, limitations, and medical treatments appears to be similar across numerous of the Fraudulent TPD Applications and belongs to SEEMER.

f. Among the Fraudulent TPD Applications that SEEMER submitted or caused to be submitted, the PII of a particular physician ("Victim Doctor-1") -- including Victim Doctor-1's medical license number and forged signature -- was used to falsely certify the total and permanent disability and specific diagnoses of over approximately 70 unique Borrowers, none of whom Victim Doctor-1 had ever in fact treated or certified disabled. The identities, medical license numbers, and forged signatures of at least approximately a dozen other physicians were similarly used in connection with false certifications of total and permanent disability as part of the TPD Fraud Scheme. Based on my training and experience and participation in this investigation, I believe that the handwriting used for the

certifying physicians' information appears to be similar across numerous of the Fraudulent TPD Applications and belongs to SEEMER.

### Victim Borrower-1

11.  Based on law enforcement interviews of a particular Borrower ("Victim Borrower-1"), my discussion with other law enforcement members, my review of records related to Victim Borrower-1's student loans and the TPD discharge of those loans, and my participation in this investigation, I have learned the following, in substance and in part:

   a.   CATHERINE SEEMER, a/k/a "Catherine D'Onofrio," the defendant, submitted or caused to be submitted via email a Federal TPD Application in Victim Borrower-1's name ("Victim Borrower-1's TPD Application") as part of the TPD Fraud Scheme.

   b.   Victim Borrower-1's TPD Application resulted in the discharge under the Federal TPD Program of over approximately $100,000 worth of federal student loan obligations held by Victim Borrower-1.

   c.   Victim Borrower-1 did not fill out or submit Victim Borrower-1's TPD Application, and Victim Borrower-1 did not authorize SEEMER to fill out or submit Victim Borrower-1's TPD Application.

   d.   Victim Borrower-1's TPD Application represented that Victim Borrower-1 had a "total and permanent disability," as defined in the TPD Application. Victim Borrower-1's purported signature certified this representation. In fact, Victim Borrower-1 did not sign this certification, nor did he/she authorize SEEMER to sign the certification on Victim Borrower-1's behalf.

   e.   The Physician's Certification portion of Victim Borrower-1's TPD Application made the following representations:

      i.   Victim Borrower-1 has a medically determinable physical or mental impairment that prevents Victim Borrower-1 from engaging in any substantial gainful activity, as defined.

      ii.  Victim Borrower-1 suffers from "severe/permanent" bipolar disorder, resulting in specified limitations on physical activities (e.g. walking, sitting,

standing), daily living activities (e.g., motor, visual, hearing difficulties), and social activities (e.g., manic episodes).

   iii. Victim Doctor-1 purportedly certified that Victim Borrower-1 "has a medically determinable physical or mental impairment consistent with [Victim Doctor-1's]" representations described above.

   iv. Victim Doctor-1's professional license number and purported signature accompanied this certification.

  f. In fact, Victim Borrower-1 was never totally and permanently disabled. Victim Borrower-1 has never been diagnosed with bipolar disorder. Victim Borrower-1 never shared any of his/her medical records with SEEMER or with Victim Doctor-1. Victim Borrower-1 further confirmed that he/she was never diagnosed or treated by Victim Doctor-1. As further discussed below, Victim Doctor-1 likewise confirmed that he/she never diagnosed or treated Victim Borrower-1.

12. Based on my review of electronic communications between CATHERINE SEEMER, a/k/a "Catherine D'Onofrio," the defendant, and Victim Borrower-1, law enforcement interviews of Victim Borrower-1, my review of records of Payment App-1, my discussion with other law enforcement members, and my participation in this investigation, I have learned, in substance and in part:

  a. In or about May 2021, Victim Borrower-1 learned from a friend that SEEMER provided student loan debt counseling services. Victim Borrower-1 contacted SEEMER via text message and expressed interest in procuring SEEMER's counseling service for Victim Borrower-1's outstanding student loan debt. Victim Borrower-1 provided SEEMER with his/her personal identifying information, student loan information, and other details about Victim Borrower-1's overall personal and financial situation, including the fact that Victim Borrower-1 partially financially supported a disabled parent.

  b. SEEMER explained, in substance and in part, that she would research grant and aid programs for which Victim Borrower-1 might qualify and that she would charge approximately 20% of the total loan amount forgiven, or over approximately $20,000; SEEMER also offered Victim Borrower-1 a discount off of her fee for each additional person that Victim Borrower-1 referred to SEEMER. SEEMER subsequently told Victim Borrower-1, in substance and in part, that she had found a grant for which

Victim Borrower-1 qualified, and that she expected Victim Borrower-1's loan to be discharged within months.

   c. SEEMER arranged a monthly payment schedule for her fee and provided Victim Borrower-1 with SEEMER's Payment App-1 account information at which to receive her fee. Victim Borrower-1 ultimately paid SEEMER thousands of dollars in fees in exchange for SEEMER's services.

   d. In or about August 2021, Victim Borrower-1 began receiving correspondences from Loan Servicer-1 that indicated that Victim Borrower-1 had applied for a disability-based discharge of his/her student loan predicated on Victim Borrower-1's purported disability. Victim Borrower-1 contacted SEEMER and inquired about why his/her loan forgiveness was being processed based on Victim Borrower-1's disability when Victim Borrower-1 was not in fact disabled. SEEMER reassured Victim Borrower-1 that the disability was not in reference to Victim Borrower-1 himself/herself, but in reference to a family member of Victim Borrower-1's, whose disability could qualify Victim Borrow-1. SEEMER further explained, in substance and in part, that language such as "You" or "Your" in Federal TPD Program correspondences refers to a family member but "they don't broadcast [that] to everyone." On another occasion, SEEMER provided the same reassurances to Victim Borrower-1. When Victim Borrower-1 asked SEEMER how his/her parent's disability for the TPD application would be certified, SEEMER responded that she would "take care of it."

Victim Borrower-2

13. Based on law enforcement interviews of a particular Borrower ("Victim Borrower-2"), my discussion with other law enforcement members, my review of records related to Victim Borrower-2's student loans and the TPD discharge of those loans, and my participation in this investigation, I have learned the following, in substance and in part:

   a. CATHERINE SEEMER, a/k/a "Catherine D'Onofrio," the defendant, submitted or caused to be submitted via email a Federal TPD Application in Victim Borrower-2's name ("Victim Borrower-2's TPD Application") as part of the TPD Fraud Scheme.

   b. Victim Borrower-2's TPD Application resulted in the discharge under the Federal TPD Program of over approximately $40,000 worth of federal student loans obligations held by Victim Borrower-2.

   c. Victim Borrower-2 did not fill out or submit Victim Borrower-2's TPD Application, and Victim Borrower-2 did not authorize SEEMER to fill out or submit Victim Borrower-2's TPD Application.

   d. Victim Borrower-2's TPD Application represented that Victim Borrower-2 had a "total and permanent disability," as defined in the TPD Application. Victim Borrower-2's purported signature certified this representation. In fact, Victim Borrower-2 did not sign this certification, nor authorized SEEMER to sign the certification on Victim Borrower-2's behalf.

   e. The Physician's Certification portion of Victim Borrower-2's TPD Application made the following representations:

     i. Victim Borrower-2 has a medically determinable physical or mental impairment that prevents Victim Borrower-2 from engaging in any substantial gainful activity, as defined.

     ii. Victim Borrower-2 suffers from "severe/permanent" bipolar disorder, resulting in specified limitations on physical activities (e.g. walking, sitting, standing), daily living activities (e.g., motor, visual, hearing difficulties), and social activities (e.g., manic episodes).

     iii. Victim Doctor-1 purportedly certified that Victim Borrower-2 "has a medically determinable physical or mental impairment consistent with [Victim Doctor-1's]" representations described above.

     iv. Victim Doctor-1's professional license number and purported signature accompanied this certification.

   f. In fact, Victim Borrower-2 was never totally and permanently disabled. Victim Borrower-2 has never been diagnosed with bipolar disorder. Victim Borrower-2 never shared any medical records or information about himself/herself with SEEMER or with Victim Doctor-1. Victim Borrower-2 further confirmed that he/she was never diagnosed or treated by Victim Doctor-1. As further discussed below, Victim Doctor-1 likewise confirmed that he/she never diagnosed or treated Victim Borrower-2.

 14. Based on law enforcement interviews of Victim Borrower-2, my review of financial transactions supplied by Victim Borrower-2, my discussion with other law enforcement

members, and my participation in this investigation, I have learned, in substance and in part:

a. Victim Borrower-2 is a healthcare professional who accumulated significant student loan debt in the course of earning multiple degrees. Upon entering the workforce, Victim Borrower-2 began making payments towards his/her student loan debt but soon faced financial hardship that resulted in the default of their student loans and the garnishment of their wages.

b. Victim Borrower-2 and SEEMER first met in or about 2015 in their capacities as healthcare practitioners and had frequently interacted, including in-person and by telephone. In or about February 2020, SEEMER contacted Victim Borrower-2 and conveyed, in substance and in part, that she was aware of a student loan forgiveness program administered by the federal government that could result in the partial or complete discharge of student loans for qualifying individuals. SEEMER conveyed, in substance and in part, that as a healthcare practitioner, Victim Borrower-2 likely qualified under the program. SEEMER explained, in substance and in part, that she had experience completing the paperwork for the program and could assist Victim Borrower-2 for a fee.

c. Victim Borrower-2 expressed interest and, at SEEMER's request, provided SEEMER with Victim Borrower-2's PII and student loan information. SEEMER also inquired about the health of Victim Borrower-2's parents, and Victim Borrower-2 explained that he/she had a parent with high-blood pressure and heart issues.

d. SEEMER charged Victim Borrower-2 thousands of dollars as her fee and set forth a fee schedule. SEEMER directed Victim Borrower-2 to pay the fee in increments to a particular mobile payment application account that SEEMER said belonged to her husband; Victim Borrower-2 paid SEEMER the fees as directed.

e. SEEMER told Victim Borrower-2, in substance and in part, that she would pay Victim Borrower-2 a referral fee for each additional Borrower that Victim Borrower-2 referred to SEEMER for student loan discharge.

13

Victim Doctor-1

15. Based on law enforcement interviews of Victim Doctor-1, my review of student loan and TPD discharge-related records from DOE, the Loan Servicers, my discussion with other law enforcement members, and my participation in this investigation, I have learned the following, in substance and in part:

    a. Victim Doctor-1 is a doctor of internal medicine, who generally does not treat patients for psychiatric disorders such as those represented in the physician certifications submitted with the Fraudulent TDP Applications.

    b. Victim Doctor-1 is not familiar with CATHERINE SEEMER, the defendant.

    c. Victim Doctor-1 did not recall certifying any total and permanent disability of a patient in connection with an application for student TPD Loan Programs.

    d. Victim Doctor-1 has never diagnosed or treated Victim Borrower-1 or Victim Borrower-2. Victim Doctor-1 did not complete or sign the physician certifications contained in Victim Borrower-1's Application or Victim Borrower-2's Application, nor authorized anyone to use his/her name, medical license number, or signature to do so.

    e. Victim Doctor-1 has never diagnosed, treated, or certified the disability of numerous other Borrowers whose applications contained a physician certification purportedly completed and signed by Victim Doctor-1, nor authorized anyone to use his/her name, medical license number, or signature to do so.

[Continued on next page]

WHEREFORE, I respectfully request that a warrant be issued for the arrest of CATHERINE SEEMER, a/k/a "Catherine D'Onofrio," the defendant, and that she be arrested and imprisoned or bailed, as the case may be.

_____
ANTHONY PERSAUD
Special Agent
U.S. Department of Education
Office of Inspector General


Sworn to me this 13th day of June, 2022

_____
THE HONORABLE ANDREW E. KRAUSE
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK